**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**


**EDWARD BUFORD** **PLAINTIFF**

**V.** **NO. 2:12-CV-00089-DMB-JMV**

**COAHOMA AGRICULTURAL HIGH**
**SCHOOL; and DR. I.D. THOMPSON,**
**Individually** **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND**
**DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This is an employment discrimination action brought by Plaintiff Edward Buford against

his former employer, Defendant Coahoma Agricultural High School ("CAHS"); and his former

supervisor, Defendant Dr. I.D. Thompson, the principal of CAHS. Plaintiff alleges that during

his employment at CAHS, Defendant Thompson and other school employees subjected him to

discriminatory working conditions and discipline on the basis of his religion, in violation of the

First Amendment to the United States Constitution and Title VII of the Civil Rights Act.

Plaintiff further contends Defendant CAHS, in violation of Title VII, wrongfully disciplined him

in retaliation for his filing of a charge of discrimination with the Equal Employment Opportunity

Commission. Against Defendant Thompson in his individual capacity, Plaintiff alleges a state

law bullying claim.

Defendants have filed a Motion for Summary Judgment on all claims. Doc. #41. For the

reasons below, Defendants' Motion is **GRANTED in part and DENIED in part.**

# I.
## Summary Judgment Standard

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. International Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Id.* at 411–12 (internal quotation marks omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id.* at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Environment & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

**II.**
**<u>Relevant Facts</u>**

Plaintiff is an African American male currently residing in Helena, Arkansas.  Doc. #41-1 at 59, 107.  In August 1994, Plaintiff, then a self-identified follower of Islam, was hired as a "Building Trades Instructor" at CAHS in Clarksdale, Mississippi.  *Id.* at 55–56, 69, 75–76; Doc. #3 at ¶ 3.  In his class, Plaintiff taught students the planning and execution of various "building trades," including carpentry, masonry, and plumbing.  *Id.* at 74–76.  These lessons also included instruction on how to use power tools safely.  *Id.* at 75–76.  Plaintiff retained his title of Building Trades Instructor nearly seventeen years until his employment was terminated in March 2011.  *Id.* at 55–56, 69.

### A.  The Tenure of Principals McBride and Brown (1994-2007)

When Plaintiff began his employment, he was supervised by then-principal Ms. McBride.[1]  Doc. #41-1 at 70.  During Ms. McBride's tenure as principal, Plaintiff observed what he described as "Christian services" at the school, such as the invocation of prayer at the beginning of PTA meetings.  *Id.* at 82, 84.  Although Plaintiff was then a follower of Islam, the services did not "bother" him because he was allowed to excuse himself from the activities.  *Id.* at 82–83.  Students and faculty asked Plaintiff why he left meetings during prayer and Plaintiff would answer that his absences were due to his religious beliefs.  *Id.* at 83–84.

Plaintiff described the assembly services at CAHS as "what you see on a Sunday morning worship."  *Id.* at 92.  Specifically, Plaintiff observed "employees singing gospel, … the college choir singing gospel [and] preaching [from] preachers in the community."  *Id.*  On one occasion, Plaintiff witnessed a custodian "change[] out of her work clothes and put on a nice Sunday dress

---

[1] The summary judgment record does not indicate Ms. McBride's first name or the first names of other persons mentioned herein.

3

shirt and she was singing too." *Id.* at 92–93. These types of assemblies occurred on Thanksgiving, Black History Month, coronation, and four award days. *Id.* at 93.

In 1997, John Brown replaced McBride as principal. Doc. #41-1 at 70. However, the "Sunday morning worship" assemblies Plaintiff described during McBride's tenure continued. Plaintiff elaborated on one such an event that occurred while he was present at CAHS's student and faculty Thanksgiving Program approximately eight years after Brown's arrival. *Id.* at 86–88. The program involved what Plaintiff characterized as "Christian singing" and "preaching and praying." *Id.* at 86–87. When the singing began, Plaintiff stepped into the hall. *Id.* Plaintiff regularly stepped into the hall when an assembly involved what he deemed to be religious material. *Id.* at 87-88.

While Plaintiff was in the hall, Principal Brown dismissed the students but called for a faculty meeting that afternoon.[2] Doc. #41-1 at 88. According to Plaintiff, Brown's assembly announcement of a faculty meeting was unusual because announcements of faculty meetings were regularly posted near the faculty sign-in area on the day of the meeting. *Id.* at 87. Due to his position outside the assembly area, Plaintiff did not hear the meeting announcement and ultimately missed the meeting. *Id.* at 87–88.

That day, Principal Brown sent Plaintiff a letter informing him of the missed meeting and stating, "In the future, please attend all programs for students and don't leave the campus until the designated check-out time for faculty and staff members." Doc. #41-3. Copies of the letter were sent to "Dr. Vivian Presley, Superintendent," and to "Dr. Evelyn Wofford, Asst. Superintendent." *Id.*

---

[2] In the late 1990s or early 2000s, according to Plaintiff, a faculty member made a statement in a faculty meeting that "we're all Christians in here." Doc. #41-1 at 123.

By letter dated December 1, 2005, Plaintiff responded to Brown's letter, stating in relevant part:

> [M]y religious belief rest[s] with the Islamic faith. It is hard to sit and observe practices that are held to be wrong and disgraceful. Prayer is sacred and when I look around and see students playing and talking during open prayer they are sinning. I've tried on many occasions to sit through religious observances but I can't. I don't think any student nor faculty member should compromise their religious beliefs. I am requesting that doing [sic] any event or program that includes opening prayer that I be excluded from the program area.

Doc. #41-4. In his letter, Plaintiff explained that he did not hear the announcement regarding the faculty meeting, and that he did not leave the campus as Brown's letter alleged. *Id.*

Principal Brown responded to Plaintiff by letter dated December 9, 2005. Doc. #41-5. He wrote, "I think you are getting a student's rights in reference to religion mixed up with your rights and responsibilities as an employee." *Id.* Despite this admonition, the letter continued, "I will grant you the opportunity to leave the area where the prayer is being recited, but you will be required to return as soon as the prayer is over and continue monitoring and supervising students." *Id.*

Sometime after 2005, Plaintiff "found out" he was a Jew. Doc. #41-1 at 104. Plaintiff's change in self-identification stemmed from his belief that he was descended from one of the "twelve tribes of Israelites." [3] *Id.* at 101.

At an unspecified time, Ms. Lucas, the school's vocational counselor, entered Plaintiff's classroom during a class and said, "don't y'all listen to Brother Buford, he's going out of the world backwards." Doc. #41-1 at 105. Also, at an unspecified time, a faculty member passed out bibles in the hallway. *Id.* at 125–26.

---

[3] Despite his identification as "a Jew," Plaintiff has not undergone a conversion under Jewish traditions and considers himself separate from followers of the traditional Jewish faith, who he considers "imposters." Doc. #41-1 at 111–12.

### B. Defendant Thompson's Tenure (2007-2011)

Sometime in 2007, Defendant Thompson replaced Brown as the principal of the school. Doc. #41-12 at 10. Plaintiff informed Thompson at some point that he was Jewish. Doc. #41-1 at 116.

The school assemblies Plaintiff deemed "Sunday morning worship" services apparently persisted after Defendant Thompson became CAHS's principal. Thompson himself testified that such programs involve readings of scripture from the Bible, singing of "religious songs" and prayer. Doc. #41-12 at 32–33. Confirming at deposition that he conducted prayers at assemblies, Thompson testified that it was his belief that district policy allowed prayer as long "as it's not invasive or…does not have a negative effect on anyone." *Id.* at 16, 58. In this regard, when describing commencement ceremonies, he testified there would be "[a] prayer for sure…and sometimes there is scripture." *Id.* at 70. Thompson also testified that he delivered prayers to the student body on occasion. *Id.* at 58.

For the 2008 and 2009 school years, absence reports were circulated with "Christian religious scripture." Doc. #41-1 at 122; Doc. #41-13 at 12–13. Although Plaintiff lodged a complaint, the school continued to include the scripture in the reports. Doc. #41-1 at 122. The reports contained occasional references to "Jesus" or "Christ." *See, e.g.,* Doc. #45-13 at 11 ("Don't talk yourself into a disaster before the day even begins. Instead say, 'I am the righteousness of God in Christ; because he is with me today, I will rejoice in all things.'"). The reports ceased when the school changed to an electronic attendance system. Doc. #41-13 at 12.

At weekly faculty meetings, Thompson expressed his beliefs "about God and about us being spiritual beings." Doc. #41-1 at 149. When Plaintiff complained about the content of the

faculty meetings, Thompson told Plaintiff "Mr. Buford, you do what you want to do and I'll do what I want. If you don't like it, leave." *Id.*

On March 2, 2009, Thompson issued Plaintiff a "Letter of Reprimand." Doc. #41-6. The letter alleged that on February 20, 2009, Vocational Counselor Lucas performed an inventory of equipment and was told by Plaintiff that certain equipment was in a closet and would be available for inventory on February 23, 2009, when in fact Plaintiff had taken the property to his home. *Id.* The letter purported to be "an official reprimand for failure to maintain accountability for all equipment under your control, efforts to undermine the inventory process by misleading Mrs. Lucas as to the equipment's whereabouts and for removing school equipment from the campus without prior approval." *Id.* (emphasis omitted).

In the spring of 2009, a student in one of Plaintiff's classes suffered an eye injury caused by a projected staple. Doc. #41-1 at 133; Doc. #41-2 at ¶ 16. Plaintiff does not dispute the occurrence of this event.

From August 2009 through Plaintiff's termination in March 2011, Defendant Thompson would approach Plaintiff and hum Christian hymns while looking at Plaintiff. Doc. #41-1 at 120–21. Plaintiff would try to move away from Thompson but Thompson would follow him. *Id.* at 121. In response, Plaintiff "started to hit" Thompson and ask, "[W]hy don't you leave me alone, sir, with that humming and stuff." *Id.* According to Plaintiff, Thompson would "hit [Plaintiff] back" and say, "I can hum if I want." *Id.* Plaintiff alleges that Thompson acted in this fashion approximately five days a week, twice a day. *Id.* Defendant Thompson denies ever being accused of humming. Doc. #41-12 at 60.

On March 31, 2010, Defendant Thompson issued Plaintiff a written official reprimand "for purposefully misrepresenting the Coahoma Agricultural High School Building Trades

Program by signing into [a teacher training workshop] and never attending the workshop."  Doc. #41-7.  The March 31 letter also provided that "[you] should…be aware that because none of your students have passed the MS-CPAS Test during your tenure, your continued employment will be based on a 30% MS-CPAS Test passing rate by your students in school year 2010-2011." *Id*.  The letter continued, "As a first step toward accomplishing the aforementioned expectation, please submit a plan of action including how you plan to meet this objective.  This plan of action should be submitted on or before May 14, 2010."  *Id*.  It is undisputed that Plaintiff never submitted such a plan.  Doc. #41-1 at 157.

At a faculty meeting in August 2010, Thompson distributed a poem called "Why God Made Teachers."  Doc. #41-1 at 119–20.  The poem, attributed to an author named Kevin William Huff, read:

> When God created teachers, / He gave us special friends / To help us understand His world / And truly comprehend / The beauty and the wonder / Of everything we see, / And become a better person / With each discovery. / When God created teachers, / He gave us special guides / To show us ways in which to grow / So we can all decide / How to live and how to do / What's right instead of wrong, / To lead us so that we can lead / And learn how to be strong. / Why God created teachers, / In His wisdom and His grace, / Was to help us learn to make our world / A better, wiser place.

Doc. #45-13 at 16.

On October 18, 2010, Plaintiff filed a charge of discrimination with the EEOC against Defendant CAHS.[4]  Doc. #3 at Ex. A.  The charge, which alleged continuing race and religious discrimination from April 21, 2010, stated, among other things:

> As a Vocational Teacher, I have been denied school supplies to assist with my teaching curriculum unlike a White Art Teacher (Mr. Latham).  In addition, I have been subjected to harassment when the Principal (I.D. Thompson) conducted spiritual hymns and discussed God in my presence.  I do not practice the same religious belief as the Principal.  In addition, I was informed

---

[4] The document is stamped "RECEIVED" on October 12, 2010.  Doc. #3 at Ex. A.  However, the form itself is dated October 18, 2010.  *Id*.

that my employment was based on the passing rate of my students for this school year (2010-2011).

*Id.*

In the fall of 2010, Dr. Wofford, the assistant superintendent, brought a white man with a yarmulke on his head to Plaintiff's classroom. Doc. #41-1 at 106–07; Doc. #41-19 at 31. Later that day, she told Plaintiff that the man he met was "the real deal." Doc. #41-1 at 106. Plaintiff believed this comment to mean that he was not a "real" Jew and that Dr. Wofford did not believe he was a "real" Jew because he was black.[5] *Id.* at 106–07, 145–46.

During October 2010, a student broke a bone in his hand during one of Plaintiff's classes. Doc. #41-1 at 143. Like the eye injury incident the year before, Plaintiff does not dispute that this event occurred in his classroom.

At a faculty meeting in January 2011, Defendant Thompson again distributed the "Why God Made Teachers" sheet. Doc. #41-1 at 119–120. And, at a faculty meeting at a steakhouse in Clarksdale, Thompson informed the faculty that a voice told him to preach the gospel of Jesus Christ. *Id.* at 125. On three or four occasions in 2011, Thompson told Plaintiff that he would go to hell because he was not a Christian. *Id.* at 121-22, 129.

On February 19, 2011, following the complaint of a parent, Thompson began an investigation into an allegation that on February 14, 2011, two students had engaged in sexual intercourse in a restroom adjacent to Plaintiff's classroom. Doc. #41-2, at ¶¶ 5–8. During the investigation, Thompson discovered that one of the students involved in the incident was "supposed to be under [Plaintiff's] supervision and control when the incident occurred." *Id.* at ¶

---

[5] Plaintiff believes that Dr. Wofford engaged in race discrimination when she: (1) denied him drafting supplies while purchasing art supplies for a white art teacher, and (2) frequently referred to a room full of African American teachers as "you people." Doc. #41-1 at 145–47. Plaintiff's complaint, however, does not allege a cause of action for race discrimination.

7.  Plaintiff stated during the investigation that he informed Emmanuel Lackey, a faculty member, of the incident—a claim Lackey denied.  *Id.* at ¶¶ 5–8.

On March 7, 2011, Thompson drafted a written notice of suspension informing Plaintiff that "[a]s a result of your failure to provide adequate supervision of your students resulting in [the February 14] incident, you are hereby suspended with pay as of today, March 7, 2011 at 3:30 PM.  You will be notified when or if you are to return to campus."[6]  Doc. #41-9.  The letter was delivered that day to Plaintiff by multiple police officers at 3:00 p.m.  Doc. #41-1 at 134–35.  After Plaintiff received the letter, he approached Thompson at the campus bus stop and "chewed him out good."  Doc. #41-1 at 134–36; Doc. #41-2 at ¶ 11.  Thompson claims that Plaintiff threatened him but Plaintiff denies such threats.  Doc. #41-1 at 165.

After his interaction with Thompson, Plaintiff went to Dr. Wofford's office.  Doc. #41-1 at 135.  Wofford was unable to speak with Plaintiff initially.  Doc. #41-10 at ¶¶ 5, 6.  Plaintiff returned to Wofford's office later that day, however, and complained to her about "abuse" and being "set…up for failure" due to a lack of proper equipment.  *Id.* at ¶ 7.  At the end of the meeting with Wofford, Plaintiff stated, "I'm leaving, I can't work here anymore.  I don't feel comfortable on the campus.  I'm taking my things and I'm not coming back…."  *Id.*  When he left Wofford's office, Plaintiff removed his refrigerator and his papers from his office because he felt that he may not be allowed to come back.  Doc. #41-1 at 162–63.  The following day, Plaintiff arranged to have other personal effects from his office delivered to him.  Doc. #41-13 at 22.

On March 9, 2011, Thompson sent a letter to Dr. Vivian Presley, the superintendent, recommending Plaintiff's termination.  Doc. #41-11.  The letter read in full:

---

[6] The letter recited other alleged infractions committed by Plaintiff.  Doc. #41-9.  However, the February 14 incident is the only infraction listed as justification for the suspension.

On Monday, March 7, 2011, Mr. Edward Buford, Building Trades I and II Instructor, was suspended for failure to provide adequate supervision of his students resulting in two students engaging in sexual misconduct. Unfortunately, this incident represents a continuation of missteps by Mr. Buford that undermine the safety, security, accreditation, and credibility of the Coahoma Agricultural High School District (See enclosures). Also, at the end of the day on March 7 Mr. Buford approached me while students were boarding the buses for home and began making threatening and profane remarks in the presence of our students and other staff members.

I am therefore recommending Mr. Buford's immediate termination as the Building Trades I and II Instructor at Coahoma Agricultural High School.

*Id.*

Also on March 9, 2011, Plaintiff filed a second charge of discrimination with the EEOC. Doc. #3 at Ex. C. In this second charge, Plaintiff alleged that his March 7, 2011, suspension was retaliation for his previous EEOC charge. *Id.* As evidence of retaliation, Plaintiff alleged that a "Mr. James," who was responsible for the female student, was not suspended. *Id.*

On March 14, 2011, Superintendent Presley submitted her "2011-2012 Personnel Recommendations" to the Coahoma Community College and Agricultural High School Board of Trustees. Doc. #41-14 at 8. In her recommendation, Presley listed Plaintiff's name under the "termination" heading rather than the resignation heading. *Id.* at 10. Presley's recommendations were accepted by the Board on March 14, 2011. *Id.* at 5–6. Plaintiff was notified of his termination that day. Doc. #41-15.

Plaintiff's notice of termination stated that "[t]he decision to terminate you is based upon your failure to maintain satisfactory supervision of your students and lack of classroom management which have resulted in bodily injuries to students." *Id.* The notice also provided that "on March 7, 2011 you resigned your job and abandoned your contractual duties as an instructor." *Id.*

Plaintiff timely requested a hearing regarding his termination; his request was approved on March 23, 2011. Doc. #41-16. On April 6, 2011, Plaintiff amended his second EEOC charge to reflect the subsequent termination. Doc. #3 at Ex. D.

By letter dated May 2, 2011, Presley wrote Plaintiff's attorney at the time, enumerating "additional allegations, reasons, and facts as to the decision of non-renewal and termination ...." Doc. #41-17. Specifically, the letter listed the following allegations:

1. Because of the failure of Mr. Buford to supervise students under his supervision, an inordinate number of accidents have occurred during the last three years causing injuries to students.

2. Mr. Buford has failed to observe and control the improper conduct of his students and other students for whom he had responsibility resulting in an unfavorable learning environment. This environment extended to the fact that Mr. Buford allowed students to consume beverages and snacks that he had sold to them while in class.

3. Mr. Buford has failed to provide sufficient instruction to his students to allow them to pass mandated state assessments. In the past ten years only two students have passed the Mississippi C-PAS test in spite of the fact that Mr. Buford has had very small classes with ample opportunity for individual instruction.

4. Mr. Buford's failure to adequately instruct his students has threatened the district's ability to continue offering a Building Trades program. The Mississippi Department of Education, Office of Vocational Education has continuously placed the Building Trades program on Improvement Plans in anticipation of denying funding to the program. These improvement plans were necessitated by the very low test scores.

5. Mr. Buford has taken machines and equipment belonging to the district to his home out of state in violation of state and district regulations.

6. Mr. Buford's failure to properly observe and control students under his direct supervision resulted in two students (both minors) engaging in sexual intercourse in the restroom adjacent to his classroom during one of his instructional periods.

*Id.*

The hearing regarding Plaintiff's termination was held on June 15 and July 19, 2011. Doc. #41-18. On September 8, 2011, the Hearing Officer issued a 74-page report detailing the relevant factual allegations. Doc. #41-19. The report largely substantiated the relevant allegations and concluded "that termination of the certified school employee would be an appropriate employment decision based on all the circumstances." *Id.* at 72.

On October 10, 2011, the Board held a meeting to consider the issue of Plaintiff's termination, among other things. Doc. #41-14 at 17-18. Plaintiff and his attorney attended the meeting and made statements to the Board. *Id.* at 18. Following the Board's tour of Plaintiff's classroom after a special meeting held October 31, 2011, the Board upheld Plaintiff's termination. Doc. #41-14 at 18, 20.

On February 28, 2012, the EEOC issued Plaintiff a notice of right to sue. Doc. #3 at Ex. E. This action followed.[7]

### III.
### Analysis

Plaintiff's amended complaint asserts four types of claims: (1) claims under 42 U.S.C. § 1983 against both Defendants for violations of Plaintiff's religious rights under the First Amendment; (2) a claim under Title VII of the Civil Rights Act against Defendant CAHS for religious discrimination; (3) a bullying claim under Mississippi state law against Defendant Thompson ; and (4) a Title VII claim against Defendant CAHS for unlawful retaliation. Doc. #3. In his summary judgment responsive brief, Plaintiff voluntarily dismissed his bullying claim. Doc. #45 at 9. Accordingly, this Court will consider only the claims brought under § 1983 and Title VII.

---

[7] Plaintiff filed his initial complaint in the Delta Division of the Northern District Court of Mississippi on May 24, 2012, then filed a First Amended Complaint five days later on May 29, 2012. Doc. #3.

## A.  Section 1983

Section 1983 provides a cause of action against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates another's constitutional rights.  42 U.S.C. § 1983.  "To state a section 1983 claim, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law."  *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (internal quotation marks omitted).  Here, Plaintiff alleges that Defendants violated his rights guaranteed under the Establishment Clause and the Free Exercise Clause of the First Amendment.  Doc. #3 at ¶ 25.

### 1.  Establishment Clause

The Establishment Clause of the First Amendment states "Congress shall make no law respecting an establishment of religion."  U.S. CONST. amend. I.  This provision "prohibits government from abandoning secular purposes ... to favor the adherents of any sect or religious organization."  *Gillette v. United States*, 401 U.S. 437, 450 (1971).  "The establishment clause has been incorporated into the fourteenth amendment and held applicable to the states."  *O'Hair v. White*, 675 F.2d 680, 683 n.3 (5th Cir. 1982).

Plaintiff contends that his Establishment Clause rights were violated by both Defendants through:  (1) the distribution of "daily absentee reports with scriptures that were Christian based in nature;" (2) Defendant Thompson's distribution "to the faculty and staff a written piece entitled 'Why God Made Teachers;'" and (3) the "singing [of] Christian based hymns, scripture reading and praying at certain events at the school."[8]  Doc. #45 at 9–10.

---

[8] Although Plaintiff's complaint mentions his discipline and termination as First Amendment violations, his response to the motion for summary judgment makes no such argument.  *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) ("[Plaintiff's] failure to pursue [her] claim beyond her complaint constituted

When considering practices challenged on Establishment Clause grounds, the Fifth Circuit employs "three complementary (and occasionally overlapping) tests established by the Supreme Court." *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 814 (5th Cir. 1999), *aff'd*, 530 U.S. 290 (2000). The three tests are known as the *Lemon* Test, the Coercion Test, and the Endorsement Test. *Id.* at 814–15.

Under the *Lemon* Test, "a government practice is unconstitutional if (1) it lacks a secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion." *Santa Fe Indep. Sch. Dist.*, 168 F.3d at 814. Pursuant to the Coercion Test, "[u]nconstitutional coercion occurs when: (1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors." *Id.* (internal punctuation omitted). Finally, under the Endorsement Test, "[t]he government unconstitutionally endorses religion when it conveys a message that religion is 'favored,' 'referred' or 'promoted' over other beliefs." *Id.* (internal punctuation omitted). In practice, Fifth Circuit courts have folded the Endorsement and Coercion tests into the second prong of the *Lemon* Test. *See Oxford v. Beaumont Indep. Sch. Dist.*, 224 F.Supp.2d 1099, 1107 (E.D. Tex. 2002) (citing *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462 (5th Cir. 2001)).

Of relevance here, when a state-sponsored activity is challenged under the Establishment Clause, it is no answer to say that a plaintiff had the opportunity to exempt himself from the activity. *See Engel v. Vitale*, 370 U.S. 421, 430 (1962) ("The respondents' argument…that the [activity] permits those who wish to do so to remain silent or be excused from the room, ignores the essential nature of the program's constitutional defects"); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1287 (11th Cir. 2004) ("That students were not actually

---

abandonment."); *see also Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

forced to pray during the moment of silence, and may have been free to leave the room, does not alleviate the constitutional infirmities of [the] moment of silence"). Furthermore, it is no answer to say that some prayers were nonsectarian. *See Lee v. Weisman*, 505 U.S. 577, 594 (1992) ("That the intrusion…sought to be civic or nonsectarian rather than pertaining to one sect does not lessen the offense or isolation of the objects. At best it narrows their number, at worst increases their sense of isolation and affront").

### a. Secular Purpose

"Courts normally defer to a government's statement of secular purpose. That purpose, however, must be sincere and not a sham." *Beaumont Indep. Sch. Dist.*, 240 F.3d at 468. Additionally the purpose cannot be "secondary to a religious objective." *McCreary Cnty. v. ACLU*, 545 U.S. 844, 864 (2005). In making this determination, courts consider the totality of the circumstances surrounding the challenged act. *Freethought Soc. of Greater Philadelphia v. Chester Cnty.*, 334 F.3d 247, 262 (3d Cir. 2003).

Here, Thompson testified that he distributed the poem because he "believe[d] it to be something that promotes goodwill and also…to inspire teachers to believe in themselves and to believe that they can and should do a good job…." Doc. #41-12 at 20. But, Defendants have not offered a secular purpose for the scripture on the absence reports or the heavily religious tone of the school assemblies.

Insofar as Defendants have failed to offer any secular purpose for the absence reports and school assemblies, the Court concludes that there is a genuine issue of material fact as to whether a secular purpose supported such acts. While it is a close call, the religious tone of the poem convinces this Court that there also is a genuine issue of material fact as to whether the distribution of the poem was supported by a secular purpose.

### b. Advances or Inhibits Religion

As explained above, the Fifth Circuit has combined the second prong of the *Lemon* Test –

which asks whether a practice advances or inhibits religion – with the Coercion and Endorsement

Tests articulated by the Supreme Court. *Oxford*, 224 F.Supp.2d at 1107–08. Accordingly, the

second prong is violated if the challenged practice "caused state-sponsored inculcation of

religious beliefs" or if "the government activity endorses religion by effectively pronouncing that

religion is preferred over no-religion." *Id.*

There can be no doubt that a genuine issue of material fact exists as to whether the

school's circulation of absence reports with references to God and Christ and its sponsorship of

assemblies incorporating prayers (sometimes performed by the school's principal), readings of

scripture, and "religious songs," constituted impermissible endorsements of religion. *See*

*Ingebretsen v. Jackson Public School Dist.*, 864 F.Supp. 1473, 1489 (S.D. Miss. 1994) ("The

court further finds that permitting students to offer nonsectarian, nonproseltyzing student-

initiated voluntary prayer at noncompulsory school-related student assemblies may also violate

the tenets of *Lemon*"). Similarly, there is a genuine issue of material fact as to whether the

distribution of "Why God Made Teachers" at two mandatory faculty meetings constituted an

unconstitutional endorsement of religion. *See Warnock v. Archer*, 380 F.3d 1076, 1080 (8th Cir.

2004) ("We believe that prayers at mandatory teacher meetings and in-service training convey

such a decisive endorsement").

### c. Excessive Entanglement

"[T]o assess entanglement, [courts] have looked to 'the character and purpose of the

institutions that are benefitted, the nature of the aid that the State provides, and the resulting

relationship between the government and religious authority.'" *Agostini v. Felton*, 521 U.S. 203,

232–33 (1997) (quoting *Lemon*, 403 U.S. at 615)). "Entanglement is a question of kind of and degree." *Lynch v. Donnelly*, 465 U.S. 668, 684 (1984). "In deciding questions of entanglement, the Supreme Court has been particularly concerned about 'ongoing, day-to-day interaction between church and state.'" *North Carolina Civil Liberties Union Legal Found. v. Constangy*, 947 F.2d 1145, 1152 (4th Cir. 1991) (quoting *Lynch*, 465 U.S. at 684).

Here, the apparent frequency of the daily absentee reports and the assemblies create a genuine issue of material fact as to whether Defendant violated the third prong of *Lemon*.[9] *See Mellen v. Bunting*, 327 F.3d 355, 375 (4th Cir. 2003) ("VMI has composed, mandated, and monitored a daily prayer for its cadets. In this way, VMI has taken a position on what constitutes appropriate religious worship—an entanglement with religious activity that is forbidden by the Establishment Clause."); *Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 385 (6th Cir. 1999) (prayer before school board meetings created excessive entanglement with religion). Accordingly, Defendant's motion for summary judgment on Plaintiff's establishment clause claim must be denied.

### d. Summary

In summary, a genuine issue of material fact exists as to each of Plaintiff's Establishment Clause claims.[10] Accordingly, summary judgment is denied as to such claims.

---

[9] Having found that there is a genuine issue of material fact as to whether the distribution of the poem violated the other two prongs of the disjunctive *Lemon* test, the Court need not consider whether the practice created an excessive entanglement between religion and government. *See Freiler v. Tangiaphoa Parish Bd. of Educ.*, 185 F.3d 337, 343 (5th Cir. 1999) (*Lemon* test is disjunctive).

[10] The Supreme Court's recent opinion addressing the propriety of legislative prayers, *Town of Greece, N.Y. v. Galloway*, __ U.S. __, 134 S.Ct. 1811 (2014), has no bearing on this opinion. *See Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1276 (11th Cir. 2008) ("The [Supreme] Court has recognized that there are inherent differences between public schools and legislative bodies [and has] has treated legislative prayer differently from prayer at school events.") (internal punctuation, quotation marks, and citations omitted).

### 2. Free Exercise Clause

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law…prohibiting the free exercise [of religion]."  U.S. CONST. amend. I.  Like the Establishment Clause, the Free Exercise Clause applies to the states by virtue of its incorporation into the Fourteenth Amendment.  *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 292 (5th Cir. 2001).

"The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden."  *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989).  A practice substantially burdens the free exercise of religion if it has a "coercive effect" on a person's practice of religion.  *Robinson v. Price*, 615 F.2d 1097, 1099 (5th Cir. 1980); *see also School Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963) ("it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion").  If a plaintiff shows a substantial burden, the government must show "both that a compelling state interest justifies the [practice] and that there exist no less restrictive alternative means."  *Robinson,* 615 F.2d at 1099.

Plaintiff's argument concerning his Free Exercise claims reads in its entirety:  "In Buford's case, the school imposed requirements that aided him to believe in the Existence of God.  He wanted no part in the activities that were taking place at certain events."  Doc. #45 at 10.

While there can be no doubt that forced attendance at what amounts to a church service violates the Free Exercise Clause, nothing in the record indicates that Plaintiff was forced to attend such a service.  To the contrary, the evidence reflects that Plaintiff was free to leave

school assemblies during the times of prayer. Furthermore, there is no indication that Plaintiff was required to read either the poem or the scripture included in the absence reports. Finally, even if Plaintiff could show he was forced to read the documents, he has not shown that such coercion affected the practice of his religion. *See Mozert v. Hawkins Cnty. Bd. of Educ.,* 827 F.2d 1058, 1065 (6th Cir. 1987) ("The requirement that students read the assigned materials and attend reading classes, in the absence of a showing that this participation entailed affirmation or denial of a religious belief, or performance or non-performance of a religious exercise or practice, does not place an unconstitutional burden on the students' free exercise of religion"). Accordingly, summary judgment is warranted on Plaintiff's Free Exercise claims. *Schempp*, 374 U.S. at 223.

### 3. Title VII Violations Brought Under § 1983

Plaintiff also asserts claims under section 1983 for harassment due to his religion. Doc. #3 at ¶ 27. In his response to the summary judgment motion, Plaintiff appears to argue that these claims are based upon violations of Title VII. Doc. #45 at 10–13; Doc. 3 at ¶ VIII. Because these claims derive from a violation of Title VII, they must be analyzed under the appropriate Title VII frameworks. *Merwine v. Bd. of Trs. for State Insts. of Higher Learning*, 754 F.2d 631, 635 n.3 (5th Cir. 1985) ("When a § 1983 claim is used as a parallel to a Title VII claim under a given set of facts, the elements required to be established for each claim are deemed the same under both statutes"). The Court does so below.

### B. Title VII

"Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., prohibits discrimination on the basis of race, color, religion, sex, or national origin in federal and private employment." *Fitzgerald v. Secretary, U.S. Dep't of Veteran Affairs*, 121 F.3d 203, 206

(5th Cir. 1997). The law also prohibits retaliation against any employee or applicant for employment because such person "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In the present case, Plaintiff contends that he was subjected to unlawful religious harassment which resulted in a hostile work environment, and that he was suspended and terminated on the basis of his having filed a charge of discrimination with the EEOC.

### 1. Harassment

"To state a hostile work environment claim under Title VII, the plaintiff must show that: (1) the victim belongs to a protected group; (2) the victim was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the victim's employer knew or should have known of the harassment and failed to take prompt remedial action." *E.E.O.C. v. WC&M Enter., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007). "[W]here the harassment is allegedly committed by a supervisor with immediate (or successively higher) authority over the harassment victim, the plaintiff employee needs to satisfy only the first four of the elements listed above." *Thorne v. Leroy Danos Maint. Services, Inc.*, 683 F.Supp.2d 433, 441–42 (E.D. La. 2010) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). In their summary judgment motion, Defendants challenge only the fourth element. Doc. #42 at 25–27.

"For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive." *WC&M Enterprises, Inc.,* 496 F.3d at 399. There is no question that Plaintiff deems the complained of conduct to be subjectively offensive. To determine whether harassment is

objectively offensive, "courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Id.* "Under the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim as well as a continuous pattern of much less severe incidents of harassment." *Id.* at 400.

Here, Plaintiff testified that on three or four occasions, Defendant Thompson told him that he was going to hell. Doc. #41-1 at 121–22. Plaintiff also testified that from August 2009 through March 2011, Thompson would follow Plaintiff around the school humming Christian hymns, and that such conduct occurred approximately twice a day, five days per week. *Id.* at 121. Crediting Plaintiff's testimony, the evidence reflects that Thompson ignored Plaintiff's pleas to stop the humming and continued his conduct for nearly two years. *Id.* at 121–22.[11] Given the pervasiveness of this conduct, the Court concludes that there is a genuine issue of material fact as to whether the harassment altered the terms and conditions of Plaintiff's employment. *WC&M Enterprises, Inc.*, 496 F.3d at 400 ("[T]his court has found that a regular pattern of frequent verbal ridicule or insults sustained over time can constitute severe or pervasive harassment sufficient to violate Title VII"). Having found a genuine issue of material fact on this issue, summary judgment must be denied as to Plaintiff's claims alleging religious harassment under Title VII and § 1983.

---

[11] Although, Plaintiff's EEOC charge only covered conduct from April 21, 2010, he is not limited to this time frame. *See Douglas v. Mortenson Broadcasting Co.*, No. 3:04-cv-2396, 2005 WL 2778538, at *2 (N.D. Tex. Oct. 24, 2005) ("Defendant cites no legal precedent in which a Title VII cause of action alleging a pattern of related conduct by a single named perpetrator is restricted to a solitary event because a plaintiff fails to list the additional events and dates in her EEOC Charge. The clear language of relevant Fifth Circuit law dictates otherwise") (citing *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1993)); *see also Edwards v. Murphy-Brown, L.L.C.*, 760 F.Supp.2d 607, 626 (E.D. Va. 2011) (allegations "described in the earlier EEOC Charge, are not barred from consideration by this Court merely because the Plaintiff listed a date of earliest discrimination in her…EEOC Charge that was later than the alleged acts of discrimination described in her April 12, 2010 Complaint beginning this suit").

### 2.  Retaliation

Finally, Plaintiff alleges that his March 2011 suspension and March 2011 termination were unlawful retaliation for his October 2010 EEOC charge.  Where, as here, a plaintiff lacks direct evidence of unlawful retaliation, the Court applies "[t]he well-known *McDonnell Douglas* framework."  *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001).  Under *McDonnell Douglas*, a plaintiff first must establish a prime facie case by showing that: "(1) []he participated in an activity protected by Title VII; (2) [his] employer took an adverse employment action against [him]; and (3) a causal connection exists between the protected activity and the materially adverse action."  *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008).  "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate…non-retaliatory reason for its employment action.  If the employer meets this burden of production, the plaintiff then bears the burden of proving that the employer's reason is a pretext for the actual retaliatory reason."  *Id.* (internal citations omitted).  The Supreme Court recently clarified that "Title VII retaliation claims must be proved according to traditional principles of but-for causation ….  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *University of Texas Southwestern Medical Center v. Nassar*, __ U.S. __, 133 S.Ct. 2517, 2533 (2013).

### a.  Prima Facie Case

There is no question that Plaintiff's October 2010 charge was protected conduct under Title VII, or that Plaintiff's suspension and termination were tangible employment actions.  Thus, the sole question at the prima facie stage is whether Plaintiff has shown "a causal

connection exists between the protected activity and the materially adverse action." *Aryain*, 534 F.3d at 484.

In addressing his burden of causation, Plaintiff relies solely on the temporal proximity between the date of his initial EEOC charge – October 18, 2010 – and the date of his suspension – March 7, 2011. Doc. #45 at 16. However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist., v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205 (10th Cir. 1997), for the proposition that a three-month gap between protected activity and employment action is insufficient). Relying on *Clark*, the Fifth Circuit has held that "temporal proximity of four months is not close enough, without additional supporting summary-judgment evidence, to establish a causal connection between the employment action and the protected conduct." *Ajao v. Bed Bath and Beyond, Inc.*, 265 Fed. App'x 258, 265 (5th Cir. 2008).

In the present matter, approximately four-and-a-half months passed between the date of Plaintiff's EEOC charge and the initial date of his suspension. And, more than four-and-a-half months passed between the initial charge and Plaintiff's termination.[12] Insofar as Plaintiff relies only on temporal proximity to establish causation, his prima facie case of retaliation in each instance fails and his retaliation claims must be dismissed. *Ajao*, 265 Fed. App'x at 265.

### IV.
### Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment [41] is **GRANTED in part and DENIED in part**. The Motion is **GRANTED** as to Plaintiff's

---

[12] Neither Plaintiff's EEOC charge nor his Complaint alleges that his termination was motivated by his second EEOC charge.

retaliation claims brought under Title VII; and his claims for violations of the First Amendment's Free Exercise Clause, brought under § 1983. The Motion is **DENIED** as to Plaintiff's harassment claims brought under Title VII and § 1983; and his claims for violations of the First Amendment's Establishment Clause, brought under § 1983.

SO ORDERED, this the 18th day of July, 2014.

**/s/ Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**